Welcome back. Thank you. May it please the Court, my name is Rebecca Smith and I represent the appellants in this matter, collectively the Native Ecosystems Council, and I would like to reserve two minutes for rebuttal. We are here today after several rounds of litigation in the District Court, which ultimately ended in the District Court's dissolution of the permanent injunction against the Lonesome Wood Logging Project outside Yellowstone National Park. And what we have on appeal is two issues that plaintiffs lost in the original District Court summary judgment order. And just to start out, I don't know if the Court has any questions about jurisdiction, but almost the exact same occurrence happened in this Court's opinion in Hapner v. Tidwell, where the District Court had granted partial summary judgment to the plaintiff, issued an injunction, there was no appeal permitted during the remand, and then once the remand was completed and the injunction was dissolved, then the plaintiffs were free to appeal to this Court. So that's the same procedural posture that we have today regarding jurisdiction. The two issues on appeal here are, first of all, there is no scientific basis to exempt 6% of the remaining occupied Canada lynx habitat from protections in the Northern Rockies Lynx Management Direction. It must be based on science, and there is no scientific basis for that exemption. That's a requirement under the Endangered Species Act. The second issue is that the Gallatin National Forest has not demonstrated compliance with its forest plan regarding population monitoring and regarding the viability provision in the plan. I'll first address the sort of more big-picture issue, which is the 6% exemption from protections under the Northern Rockies Lynx Management Direction. This is under the Endangered Species Act, which requires that 16 U.S.C. 1536a2, that in all Endangered Species Act consultations, each agency shall use the best available, the best scientific data available. And consequently, district courts have repeatedly said that failing to use the best available science is arbitrary and capricious. So we know there has to be a scientific basis for this exemption. And as a practical matter, the 6% exemption basically means that the Forest Service can allow unlimited logging on 729,000 acres, despite the importance of that habitat to lynx. And so, for example, in this case, over 1,500 acres of occupied lynx habitat will be logged using this exemption, despite the fact that it is occupied, despite the fact this is a threatened species. And the key here really is they don't know what the effect of allowing all of this logging will be. I would point the court to the government's own admission that the 6% number was not actually based on a scientific threshold. They said, we didn't base that on a threshold of habitat destruction that lynx can withstand. And so that admission, standing alone, means there was no scientific basis, which means that it is not consistent with the requirement under the Endangered Species Act. There's really no other justification in the record, and the government doesn't offer one, for how this 6% exemption is going to affect lynx or why it believed that a 6% exemption would not end up jeopardizing lynx. You said earlier that it's occupied. Do you mean that there's evidence that lynx are actually in that area? Yes, Your Honor. And so, just to step back, the Northern Rockies Lynx Management Direction applies only to occupied and mapped lynx habitat. And so that's what the exemption applies to. It only applies to occupied and mapped lynx habitat. And so that is 729,000 acres of occupied lynx habitat. The closest case that I could find on this issue is actually a district court case that basically, this was the case cited in our briefing, Native Fish Society, 992 Feds Up Second at 1115. And in that case, similar to this case, the agencies had just decided that they were going to allow up to 20% mortality from what currently existed for these fish. And the district court rejected that 20% trigger as arbitrary and capricious, saying the use of a 20% trigger is entirely unexplained. There is precisely nothing in the record that explains why 20%, rather than 10 or 30 or 40, is an appropriate target. Without some time, the agency's decision was arbitrary, as the court cannot defer to avoid. And that's basically the same thing that's happening here today. The agency decided to just arbitrarily exempt 6% of this habitat from protection without any underlying scientific rationale. That is sort of classic definition of arbitrary, when it's just a number that's sort of pulled out of thin air with no scientific basis. Regarding the second issue today before the court, the Gallatin National Forest's failure to comply with its forest plan provisions, first regarding population monitoring of old growth management indicator species, and second regarding the provision in the forest plan that requires the insurance of viability. This case is very similar to the District of Idaho case, Lands Council v. Cottrell, which was cited in our briefing, in which you had a case where there basically were no old growth species left, and nonetheless the Forest Service concluded that it was ensuring old growth species viability. And so in that case the District of Idaho cited back to this court's opinion in Native Ecosystems v. Tidwell, where this court said it is unfathomable how the Forest Service can say it's ensuring viability of this species that's not even present. And that's the same thing that we have here today in this case. This timber cell is going to log almost 500 acres of designated old growth forest in an era when almost every other national forest in the country has stopped logging old growth forest, recognizing that it's an irreplaceable resource. Nonetheless, the Gallatin is continuing, and it is representing that the species will be just fine. And as the District of Idaho stated in Lands Council v. Cottrell, that's either a Panglossian view that all will be well despite evidence to the contrary, or it's an example of fundamentally elevating form over substance. Because when we look at the substance of this case, there's no more goshawks in the area. They failed to find the pine martin. Those are the two old growth management indicator species. We know that at the statewide level goshawk are thought to be declining. Nonetheless, the Forest Service has not actually monitored the population trend. It says population trend is unknown. And so they're basically saying we're ensuring viability, but they don't know what the population trend is. They're not monitoring the population trend. And when they go out to look for the species, they're no longer there. So just as it was in Native Ecosystems Council v. Tidwell, it is unfathomable here how they could say they're ensuring old growth species viability when there are no old growth species basically left. I think that the one study that the district court cited found three goshawks on the entire forest. And we know that when they went out in 2010, they looked at 18 nest sites and only eight were still occupied, which would indicate a decline of 40% in the population. So the only time they ever go out and look, they either find the nests have been abandoned or most of the nests have been abandoned. And we know from the adjacent national forest, the Caribou-Targi National Forest, that in that case the Forest Service did go out and monitor goshawk population trend. They went out and looked at all the nests, and then they went to the nests after they had been logged. And that report, the PATLA report, which was in a peer-reviewed published journal, found that there was a correlation that the nests were not occupied as much after there had been logging. So there is something like a 40% decline in nest occupancy after logging. So we do know from other national forests that monitor that the goshawks are harmed by logging, that their populations do decline in response to logging. But in order to avoid that conclusion on this skeleton national forest, the Forest Service simply refuses to conduct the necessary data so that we know what the population trends are. And just to reiterate, that is a legal requirement under NIFMA. If there is a provision in a forest plan, the Forest Service must comply with it. And so in this case, there is a population, there is a provision in the Gallatin Forest Plan at ER 885, which mandates that the Forest Service must quote, determine population trends. And so they can't get around, that is a legal requirement that they must comply with. And they admit they haven't complied with it. If we look at, for example, ER 618, the Forest Service itself admitted, quote, population trends cannot be determined from existing data. So you have this juxtaposition between the legal requirement, which says they must determine population trend data, and their admission at ER 618 that they haven't done that. And so there's really no way legally that they can just abdicate that legal responsibility. There has been case law in this court that says if there's a habitat proxy that they can rely on. In other words, if they can figure out how much habitat a viable population need, they can rely on that. But in this case, they frankly conceded that they're not using a habitat proxy. So for example, at ER 581, they said we have not determined a threshold for the amount of old growth below which populations of dependent species would no longer be viable. So they admit they're not using habitat as a substitute. But then they also admit they haven't actually monitored population trends. And so this is a clear violation of their forest plan, which means that it's also a clear violation of NFMA. And if I could, I'd like to reserve my remaining time for rebuttal. Okay. Thank you. Thanks. Good morning. May it please the Court. My name is Jeff Bielert. I'm here on behalf of the federal appellees in this case. I'd like to start by just pointing out that context matters. I think it's very important that when the counsel comes before you and talks about some of the quotations that they've pulled out of the record, that you take a look at the context of where those quotations are coming from. And I think it's important because otherwise it's misleading. And if you don't read what the guidance of the forest plan says and you read some of these statements and they're taken out of context, it can lead you to believe that the Forest Service is not complying with the statutes at issue in this case. And that's simply not true. And I'll start with the scientific basis argument. They contend that under the Endangered Species Act that the Forest Service and the Fish and Wildlife Service need to comply with the best scientific standards. And that's absolutely right and they did so here. They say that there's nothing in the record to suggest where the 6 percent comes from. They misread the record. All you need to do is look at the citations that we provided in our brief. We talk about how the Forest Service looked at this and there was comments that were made early on during the 2007 process by which they were thinking about what can we do in exempting some fuel treatment projects. Commentators came forward to the Forest Service and said don't exempt any of the forest. Don't allow any exemptions. And the Forest Service looked at it and said no, we think that there needs to be some exemption. And they looked at this wildland urban interface area. These are areas of the forest by definition where there are human presence, where there's development. In this particular case we're talking about the lake. And there, there's development. There's residential, both private and recreational. And the Forest Service looked at that and they said you know what, we need to come up with four criteria. How, if we're going to exempt something in this forest from the treatment standards of the links amendments, how can we do that? And they said you need to have a defined area. Well, the wildland urban interface provides a defined area. We need to be able to monitor the effects of links in that defined area. The wildland urban interface allowed that. And then the other thing is we need to protect the local populations and people who are going to be visiting the forest. In this particular case you have a road. There's only one way in and out of the project area. So if there's a forest fire, the same firefighters are going to have to be coming in, are going to be going out, the people are going to be evacuating down the same route. So the Forest Service looked at this. The wildland urban interface provides a limited exemption. The Forest Service applied that exemption to historical data. It collected five years' worth of fuel treatment projects. And then it applied the exemption retroactively. And what it found was that if the 6 percent was applied, what actually there was only about 1.4 percent of that habitat, potential links habitat that would have been affected by this exemption. So the Forest Service then, in consultation with the Fish and Wildlife Service, went to them and said we're going to apply this exemption. Please take a look at it and tell us whether it will jeopardize the continued existence of the species. And so you look at the Fish and Wildlife Services in their expert biological opinion that they issued in 2007. The Fish and Wildlife Service concluded that this exemption, this wildland urban interface exemption, limited by 6 percent, will not adversely jeopardize the continued survival of links. That conclusion warrants deference. Under the APA, this Court does not impose itself as a panel of scientists, does not get to second guess the scientific analysis of the Fish and Wildlife Service. And here we have not only the 2007 programmatic biological opinion, but we also have the 2016 site-specific biological opinion. And in this biological opinion, you're taking a look at this particular project, this fuel treatment project. And there's about, the project area is about 23,000 acres. Less than 3,000 acres will be treated. And it's not like they're clear-cutting 3,000 acres. There's a number of different units spread out throughout the project area, and the Forest Service is treating those units over a six- to nine-year period. Some of the treatment units are along the road. It is to allow the firefighters to come in if there were to be a fire. And let's be clear about this. These fires are not business as usual. There are drier conditions on the forest. Forest fires are starting earlier. When there's a canopy that is closely by one another, you can create lofting firebrands. These lofting firebrands allow the fire to travel over long distances. The Forest Service is not trying to change the landscape. All the articles that they cite in their reply brief and all the things, they're inapposite. They don't apply here. What the Forest Service is doing is limiting its treatment to an area of the forest where there is development, where there's a lot of visitors. This is not an area of the forest that they're trying to change the landscape. So what the Fish and Wildlife Service did in its 2016 site-specific biological opinion, it concluded that this particular project will not jeopardize the survival of lynx as a species. And again, that is warranted deference. The Fish and Wildlife Service applied the best available science. In their brief, they talk about Kosterman's thesis. This is a master's thesis written in 2014. Read their brief. As I said, context matters. They say that we didn't apply the best available science, but they're trotting out a thesis that the Forest Service specifically wrote a letter explaining, and this is in my supplemental excerpts of record, why this thesis does not apply here. So the agencies have absolutely complied with the statutes. And, in fact, at excerpt of record 7, the district court, as a matter of fact, held that the agencies had considered Kosterman's thesis and properly rejected it. So here, the best available science was applied. It was applied at a programmatic level. It was applied at a site-specific level. They talk about the fact that native fish, okay, this is an incidental take statement. It's a district court case from Oregon talking about mortality of fish and a trigger as to when reconsultation would have to occur under the Endangered Species Act. When you look at the biological opinion, both the 2007 programmatic biological opinion as well as the 2016 site-specific biological opinion, what you'll see is there is no trigger here. The 6 percent exemption is not a trigger by which the Forest Service is saying we're going to go out and destroy, because they're not destroying. They're treating some limited areas of the forest under this exemption. It's not meant to be a trigger. So I think that the counsel has misunderstood the record. It's misread the law here, and they cannot prevail on that argument. Counsel suggests that the Forest Service has not complied with the forest plan, and we lay this out in our brief, and I encourage you to take a look at that. But under the National Forest Management Act, the Forest Service must comply with its forest plan, and it has done so here. As I mentioned, context matters. When you look at this forest plan, the Gallatin forest plan, there is a goal at Excerpt of Record 874. It says, provide habitat for viable populations of indigenous wildlife. The goal is aspirational. We explain it in Supplemental Excerpt of Record 85. It defines a goal. Each forest plan is slightly different. It's certainly true that in the Tidwell case, the Beaverhead Deer Lodge National Forest Plan had a goal. That goal is very different from the goal at issue in the Gallatin forest plan. It says, provide habitat to maintain viable populations, to ensure. Those words do not appear in the Gallatin forest plan. So it is a different goal. Also by the way, Section 219.19, this is the regulation that applied from about 1980 to 2012, that specifically said maintain viable populations. There is a number of case law, looking back to McNair, that says, look, if the forest plan incorporates that regulation, then you have to apply by it. But that's not the Gallatin forest plan. It is very different. When you take a look at Tidwell case, what you will see is that this Court rejected the proxy on proxy approach. But when it did so in its opinion, it was relying on that section, 219.19, and the fact that it was very similar to the forest plan that was issued there. It's not the same thing here. When you look at the forest plan, you see that it's aspirational. They don't need to provide viable populations. The next provision is this monitoring provision. Excerpt of record 885, and this is at number 16. And it says that the forest service must determine population trends every five years. And then it says at what precision? Moderate precision. The council in its reply brief says the forest service needs to come up with the exact number of pine martin. It has to come up with the exact number of links in this area. And that's not right. Because context matters. The plan tells you that it needs to be moderate precision. And the forest service complies with this requirement. The 2011 report for monitoring indicator species can be found at ER 598 to 623. And what you see in that is that the forest service lays out how does it monitor goshawk. And it talks about a 2005 study. This was a grid-based survey of the forest. It talks about specific site-specific surveys. Now, this is important. Council is talking about how the forest service had not observed at a project area survey. And then it pulls this quote out of context. And it suggests that the data that the forest service is relying on that it can't be relied on. But it's important that you look at that page. Because if you go up a couple little bullet points, what you see is that the overall trend of goshawk on the forest is that they are stable. The population is stable. What it was talking about when it said it didn't have data to determine population level, it was referring to site-specific surveys. So look, it's true that at a site-specific level in this particular project area, that the forest service has not observed goshawk. But that does not mean that at the forest level, which is the requirement for monitoring, at the forest level goshawk are present on the forest and their population is stable. The Gallatin has over 250,000 acres of nesting habitat for goshawk. This project treats 158 acres. The forest service and the Fish and Wildlife Service concluded this project will not have any effect on goshawk. Looking at Pine Martin, they say that we failed to monitor Pine Martin. Again, look at the slide. Every year the forest service has cooperated with Wild Things Unlimited to conduct annual surveys of Pine Martin. Pine Martin are trapped for their pelts in Montana. We know this. It may be that on a statewide, again context matters, statewide basis, Pine Martin may be in decline. But that's not on this forest. The forest service here has said that Pine Martin are abundant on the forest. Why do we know this? Because every year they go out and they survey these animals. We're looking at some of the arguments. This is, council raises a bit of scatter shot argument here and I think they confused some of their arguments. But under NEPA, under the statute, they point to this article by Patla. And Patla studied occupancy rates on a different forest. She in her report specifically said, she was looking at goshawk occupancy rates, and it's true in logged areas and unlogged areas. But Patla in her article specifically said she was not looking at long term population trends. In her article she explained that she was only looking at very limited number of nesting sites. Now council reads that and suggests that somehow it applies here. Well, it doesn't. And the forest service reasonably explained why. And it's an excerpt of record 823. You can see that. They point to Canfield's report and they suggested that it's somehow misleading. Because somewhere else in the record they suggested in response to comments that the population for goshawk was stable to increasing. Elsewhere in the EIS you'll find an accurate summary of that report. And that's at excerpt of record 548. The bottom line here is when you take a look at context, when you scratch the surface just a little bit on some of the council's arguments, what you'll find is they have no merit. Therefore I ask that you affirm the judgment in favor of the federal appellees in this case. Okay. Thank you. Thank you, Your Honor. And you've saved some time, Ms. Smith. I would first like to just start out by addressing the representation that goshawk populations are stable. Council cited to, I believe it was ER 618. What ER 618 actually says is that the population is stable globally. This says nothing about what the population actually is at the national forest level. So there's a bulleted list there at the top of ER 618 and it says, the first bullet says globally they're stable at the broadest scale. And then it goes on down and then it says based on detection surveys goshawks are present and distributed across the Gallatin National Forest, but population trends cannot be determined from existing data. And so where they have a clear unambiguous forest plan provision that requires them to determine population trends and they unequivocally are admitting that they haven't determined the population trend here at ER 618, that means they have violated the forest plan. The next thing I would like to address is the sort of representations about forest fire and, you know, that's sort of a common theme with Forest Service timber sales. Every timber sale purports to be designed to reduce forest fire risk. And I would just point the Court to what the actual Forest Service's admissions are in the record about forest fire. For example, at FER 11 where the Forest Service itself said, quote, this project will not lower the probability, and it's referring to standard placing or mixed severity fire there, nor the amount of acres burned. And so at the, and there they're talking about at the scale of the analysis area as a whole, it's actually not going to reduce standard placing or mixed severity fire. Again, that's FER 11. And that sort of undermines their entire argument here about wildfire. And the scientific literature supports that idea that it's not actually going to affect wildfire because these are the higher elevation forests that actually only burn at intervals of 100 years or more. And so at FER 43, peer-reviewed science says that no evidence suggests that spruce fir or lodgepole pine forests have experienced substantial shifts. In other words, they're the same as they naturally occurred. Also, the scientific literature, FER 50 says, quote, we expect fuel reduction treatments in high elevation forests to be generally unsuccessful in reducing fire frequency, severity, and size, giving the overriding importance of extreme climate in controlling fire regimes in this zone. So there is consensus between the scientific literature and the Forest Service itself that this will have little to any effect on actual wildfire. And then the final point I would like to address is just the idea that basically what counsel is asking you to do is blindly defer to the notion that an exemption of 6 percent of occupied lynx habitat, that 6 percent of occupied lynx habitat can be logged. He did not cite to any scientific basis for that exemption, and instead just asked this Court to give blind deference. And this is an APA case. The standard of review is arbitrary and capricious. The standard of review is not blind deference, and it is arbitrary if there is no scientific basis at all. And I see that I have run out of time, unless there's any further questions. Okay, thank both sides for very good arguments on both sides. Native Ecosystems Council versus Martin submitted for decision the last case this morning, Olympic Forest Coalition versus Coast Seafoods.
judges: Fernandez, W. Fletcher, Melloy